# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 27, 2004 Session

## STATE OF TENNESSEE v. IRA ISHMAEL MUHAMMED,[1] alias IRA ISHAMEL MUHAMMED

### Direct Appeal from the Criminal Court for Hamilton County
### Nos. 239344, 239483    Stephen M. Bevil, Judge

---

### No. E2003-01629-CCA-R3-CD
### May 10, 2004

---

The defendant, Ira Ishmael Muhammed, was convicted of attempted second degree murder, a Class B felony; two counts of aggravated assault, Class C felonies; attempted voluntary manslaughter, a Class D felony; and felony reckless endangerment which the trial court, acting as thirteenth juror, dismissed at the sentencing hearing.  He was sentenced as a Range I, standard offender to twelve years for the attempted second degree murder conviction, six years for each aggravated assault conviction, and four years for the attempted voluntary manslaughter conviction, with the sentences to be served consecutively, for an effective sentence of twenty-eight years.  On appeal, the defendant argues:  (1) the trial court erred in admitting an audiotape of telephone conversations between him and his ex-wife, one of the victims; (2) the trial court erred in not suppressing an audiotape of statements he made shortly after being shot; (3) the trial court erred in imposing consecutive sentencing; and (4) the application of consecutive sentencing is unconstitutional.  Following our review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

Clayton M. Whittaker, Chattanooga, Tennessee (on appeal); John Cavett and Barry Abbott, Chattanooga, Tennessee (at trial), for the appellant, Ira Ishmael Muhammed.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William H. Cox, III, District Attorney General; and Barry A. Steelman and Christopher D. Poole, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1]We note that the correct spelling of the defendant's last name is "Muhammad."  However, we have used the spelling that appears in the indictments.

# OPINION

## FACTS

The defendant's convictions stemmed from a shooting incident that occurred on October 26, 2001, outside his then wife's place of business, Kimberly's Hair Salon and Boutique, in Chattanooga. He shot his wife, Kimberly Muhammad, multiple times and endangered their infant son before being apprehended by police officers near Thankful Baptist Church where he was shot once.

## Trial

At the defendant's October 1-4, 2002, trial, Tony Schefano, owner of Alabama Furniture Company, testified that his business was located at the corner of Glass Street and Dodson Avenue, across the street from Ms. Muhammad's business. While doing paperwork at his desk on the morning of October 26, 2001, he heard gunshots, looked out a window, and saw a man knock down Ms. Muhammad, straddle her, and then shoot her four or five times. Ms. Muhammad "was screaming and hollering and her feet [were] flying up." Schefano grabbed a shotgun and ran outside to aid Ms. Muhammad. The pistol-wielding man jumped into a small red car and drove away in the direction of Thankful Baptist Church. Schefano described the gunman as "about five-eleven, 165 pounds, black, no shirt . . . [with a] kind of wild . . . look in his eye."

Katrina Baker testified that she was driving down Glass Street on the morning of the shooting and, while stopped at a traffic light in front of Ms. Muhammad's shop, saw a man chasing a woman around a car. The woman then darted across the street in front of traffic, with the man running after her and swinging at her with a closed fist. The woman, who was pleading for someone to help her, then fell to the ground. The man straddled her and told her in a "bad" tone of voice that "it was his child too" and that he was "tired of something, whatever was going on." The man pulled a handgun from the back of his pants, fired one shot in the air, and then shot the woman "about four" times. After taking off his shirt and jacket and throwing them to the ground, the man drove off in a red, two-door Mitsubishi Eclipse in the direction of Thankful Baptist Church. Baker described the man as African-American and "about five-six, about 180, 185 pounds, he was bald, had on a navy, some sort of work uniform, boots."

Stephen Hines, a first responder with the Chattanooga Fire Department, testified that his fire station was located about two blocks from Ms. Muhammad's business. On the day of the shooting, Ms. Muhammad, who was bleeding and "all shook up," came to the station, screaming that her husband had shot her. Hines tried to stop her bleeding and called for an ambulance.

Sergeant Craig Johnson of the Chattanooga Police Department testified that he responded to the scene of the shooting and made a videotape and a diagram of the scene, which were admitted into evidence. Johnson identified evidence recovered from the scene, including seven 9-millimeter shell casings, two 9-millimeter live rounds, two 9-millimeter projectiles, a jacket, a ball cap, a pair

-2-

of ladies' shoes, a set of keys, and bloodstains. A subsequent search of the defendant's red Mitsubishi Eclipse revealed a 9-millimeter Luger cartridge box and thirty-one live rounds of ammunition found on the front seat.

Sergeant Tim Carroll of the Chattanooga Police Department testified that he investigated the police-involved shooting of the defendant. The defendant was apprehended near Thankful Baptist Church where Carroll discovered a 9-millimeter pistol with its hammer "cocked back" in the vicinity where the defendant was shot by officers. The two officers involved, George Forbes and Matt Rogers, used .45-caliber weapons. Also recovered from the scene were bullets from the defendant's vehicle, a magazine containing live rounds near the defendant's vehicle, and .45-caliber spent casings. On cross-examination, Sergeant Carroll acknowledged that the 9-millimeter pistol did not have a round in the chamber when he found it and would not have fired in that condition. He said that the magazine was found "[p]robably 50, 60 yards" away from the gun. According to Carroll's investigation, Officer Forbes fired three shots and Officer Rogers fired one. The defendant was "shot in the chest with an exit wound to the left shoulder area." On redirect, Carroll said there was no way of knowing from a distance whether the defendant's gun had the ability to fire.

Officer George Forbes of the Chattanooga Police Department testified that he responded to a call of "unknown trouble" in the 2200 block of Glass Street where Ms. Muhammad's salon was located. He saw the defendant, who matched the description he had been provided, driving a red Mitsubishi Eclipse. Forbes, along with Officers Lockhart and Rogers, who were in separate patrol cars, pursued the defendant. The defendant subsequently lost control of his vehicle and crashed into the parking lot of Thankful Baptist Church. As the officers approached the church, Officer Rogers radioed that the defendant was armed and was fleeing through the parking lot. Forbes drew his weapon and ordered the defendant, whom he called by name, to drop his. However, the defendant ignored Forbes's commands, instead raising his gun toward the other officers. Believing that the defendant's gun was loaded, Forbes then fired three rounds at the defendant, striking him on the back side of his shoulder. The defendant then turned toward Forbes and pointed his pistol at him before dropping it and falling to the ground. The defendant told the officers, "You motherfuckers shot me. I hope all you sons of bitches motherfuckers die of anthrax. You've suppressed my people." The defendant was wearing a pair of blue "work type" pants with no shirt. Officer Forbes said that he did not learn until the incident was over that the defendant's gun did not have a magazine in it or that Officer Rogers had fired his gun at the defendant.

Officer Matthew Rogers testified that while en route to a "shots-fired" call at Kimberly's Hair Salon, he encountered the defendant driving a red Mitsubishi Eclipse. He and Officers Lockhart and Forbes pursued the defendant until the defendant lost control of his vehicle near Thankful Baptist Church. As the defendant exited his vehicle, Rogers saw a gun in his hand and radioed the dispatcher that the defendant was armed. The defendant then disappeared around a corner of the church. As Rogers cautiously approached the corner, he saw the defendant on the other side of a ditch line and ordered him to drop his weapon. Instead, the defendant pointed his gun at Rogers, looked back at Officer Forbes, and raised his gun. Rogers fired once at the defendant when he pointed his gun at Officer Forbes. After Officer Forbes shot the defendant, the defendant began

screaming, "I told that bitch I was going to get her. . . . Hope all y'all burn in hell, hope y'all die from anthrax."

Officer Ernest Craw testified that he also responded to the scene at Thankful Baptist Church. After the defendant had been shot and fell to the ground, Craw secured the area because the defendant "breeched up and tried to make a go for the weapon again." The defendant began making "outburst statements," saying, "There is no other person going to raise . . . my MF child." Craw then turned on his tape recorder and began recording the defendant's statements. This audiotape and a transcript of it were entered into evidence, and the tape was played for the jury.

Kimberly Muhammad testified that she married the defendant in November 1998 when she was thirty-seven years old and the defendant was nineteen. They separated on January 17, 2001, when the defendant ordered her to leave their home. At the time of their separation, she was five and one-half months pregnant with their child. A month later, in February 2001, the defendant began threatening her by telephone and in person at her salon. The defendant told her to "plan [her] death" and that she "need[ed] to be burned up." He also threatened their unborn child, saying, "Why are you having it, . . . you know that we both need to die, why do you want that baby[?]" She gave birth to their son, Jabril Muhammad, in March 2001 and filed for divorce in May 2001. She said the defendant's threats continued until she was shot in October 2001. Ms. Muhammad tape-recorded various telephone threats made by the defendant in August and September 2001, and this tape was admitted into evidence and played for the jury. Referencing one of the taped conversations, Ms. Muhammad said that DNA paternity testing was performed during the course of the divorce proceeding which established the defendant as the father of her son. During another conversation, the defendant asked her, "Did you not see what happened in California?" Ms. Muhammad said the defendant was referring to an incident in California "where the guy went on a rampage and . . . killed his wife, and I think she was pregnant and with children, and the in-laws too."

As to the events of October 26, 2001, Ms. Muhammad said that she had taken seven-month-old Jabril to work with her and had stepped outside to put a note on her door when she heard a loud noise. She turned around and saw the defendant jump out of his red Mitsubishi with a gun. The defendant "snatched" Jabril from her, opened the door to her shop, and let Jabril slide down his leg. The defendant then shot at Jabril, and Ms. Muhammad saw Jabril's legs "extend[] forward and g[e]t real stiff and straight" and believed he had been killed. The defendant then said, "I told you it was going to be like this, now get in here, it's your turn." She refused to go inside, and she and the defendant ended up on the far side of Glass Street across from her business. The defendant told her, "You're not going to divorce me" and started shooting "like a crazy person." After one bullet struck her breast, Ms. Muhammad fell to the ground. The defendant stood over her and continued shooting, and she crisscrossed her legs in an effort to protect herself. After the defendant stopped shooting and she realized no one was coming to her aid, Ms. Muhammad got up and ran toward the traffic light at the four-way intersection. Bleeding and hysterical, she beat on a motorist's car and pleaded with the motorist to take her to a nearby fire station. There, a fireman whom she knew rendered first-aid to her and summoned medical personnel. One of the medics informed her that they had checked on Jabril and that he was alive. Ms. Muhammad said she was struck by five bullets, her primary injuries

-4-

were to her wrist, arm, and breast, and she was hospitalized for three or four days as a result. She acknowledged that Jabril had not been injured during the incident.

On cross-examination, Ms. Muhammad said that the defendant's father died in July 2000 and that the defendant had missed his father. She said she had complied with the divorce court's orders regarding the defendant's visitation with Jabril and acknowledged that there had been problems with three or four of the visitations and that the police had been involved in one of those visits. At one point, the defendant told her to stop the visitation because he was not going to pay child support. The defendant later changed his mind and telephoned her, saying, "I want to see my G.D. son." Under her divorce attorney's advice and because of the defendant's threats, she then refused to let the defendant see Jabril even though there was a court order in effect at the time.

The twenty-three-year-old defendant testified that he and Ms. Muhammad married on November 5, 1998. He said they were having marital problems in January 2001 which caused him a great deal of stress, and his father, with whom he was "real close," had passed away which added to his stress. After a counseling session with their minister in January, the defendant became "irate" and told Ms. Muhammad to leave their home. He acknowledged that she was pregnant at that time and that their son, Jabril, was born on March 21, 2001. He said that initially another man's name was listed as the father on his son's birth certificate; therefore, he had a DNA test performed to prove paternity.

Asked about an incident that occurred in February 2001 at the C.B. Robinson Bridge, the defendant said that Ms. Muhammad had come by his house that day and asked him to take her to work. Instead of taking her to work, he drove to the bridge because he "was so distraught about everything that [they] had been through and . . . was ready to commit suicide and . . . wanted her to watch it." The defendant acknowledged that he kept a gun and a box of bullets on him at all times because he feared for his life.

The defendant said that Ms. Muhammad had filed for divorce in May 2001 and had obtained a temporary restraining order against him. Asked if he followed the court's order, the defendant replied, "I tried to do things the right way . . . the legal way, but it wasn't seeming like I was getting results and . . . I had to be the judge and the jury." He said that Ms. Muhammad had threatened to kill him in the past and had tried to shoot him. The defendant acknowledged that he had told Ms. Muhammad in September, before learning that Jabril was his son, that he did not want visitation with Jabril.

Regarding the tape-recorded telephone conversations with Ms. Muhammad, the defendant said that he was irate at the time because she had refused to let him see their son and that she "kn[e]w how to push [his] buttons." Referencing one conversation, the defendant admitted saying "[i]t's not going to be arranged through no fucking court and I piss on the court system" but said he made the comment out of anger. Referencing another conversation, the defendant explained that when he had said, "If that was not my son, I will smoke you and him too," he was "not saying that [he] wanted to actually kill [his] son." He said that he had "dealings," including sexual relations,

with Ms. Muhammad after the phone conversations occurred. According to the defendant, Ms. Muhammad manipulated him "with sex." The defendant said that he only had three visitations with his son and that Ms. Muhammad stopped bringing Jabril for visitations after the third visit even though he had court-ordered visitation.

As to the incident on October 26, 2001, the defendant testified that he had gotten the DNA test results two days earlier and learned that Jabril was in fact his son. While en route to his grandmother's house that morning, he passed by Ms. Muhammad's shop and saw her outside holding Jabril. He pulled his car over to the curb, jumped out, and told Ms. Muhammad, "We're not getting a divorce. . . . You can forget that, we're not getting a divorce." He then took Jabril out of her arms and said, "How can you keep me from my son?" Because Ms. Muhammad began to run away, the defendant pulled his gun from his waist, fired it into a flowerbed, and ordered Ms. Muhammad to "get over here." The defendant related what happened next:

> I had my coat on but I had took it off and I was bareback, bare chest, back. And my gun was right here, I had it inside my waist right here, and when I opened the door, I had tripped, stumbled, so to speak. And I was looking at [Ms. Muhammad] and I was talking to Jabril and he was fighting. A seven-month-old, you know how your children scratch in your face?

> And I don't know if you all ever seen the Carpets of Dalton commercial, but the father is holding his son and he is crying and he sits him on the floor. That's exactly what I did. And to keep from dropping him, because I didn't have a good grip on him, I let him slide down my leg, and to keep from dropping him, I set [sic] him on his stomach.

> Now, remember, I had the gun in my waist. The gun fell over Jabril and when I picked it up, I was looking at [Ms. Muhammad], and . . . boom, the gun went off, just like that. It didn't go off, I pulled the trigger, by accident, because it's just like a harry [sic] trigger, it didn't take much to pull the trigger. When I picked it up and, boom, it went off, I looked down at Jabril, and like I said, if any of y'all have ever seen the Carpets of Dalton commercial where the child was breeched . . . that's what happened.

> And then [Ms. Muhammad] said, "Oh my God." She stood in the middle of the parking lot by my car and she said, "Oh my God, my baby, my baby, my baby's dead." She fainted.

> And I said – because I had told her, I said, "Get in here." I was standing in the doorway and I said, "Get in," and she fainted. So

I walked out and I grabbed her from the arm and I told her, "No, he's not dead." I said, "Now get up and come in here."

So when I grabbed her up under her armpits to tell her to come on, I turned my back to her and I got ready to walk up the steps, and when I turned around, she was on the other side of my car[.]

And I said, "What are you doing? What are you doing? Get in here." Because all I wanted to do was play with my son. That's all I wanted to do, was to talk to her and try to convince her to try to reconcile our marriage, because I didn't want to kill her and I didn't intend to kill my child. It was reckless, I admit it, I placed him in harm's way[.]

. . . .

I walked around the vehicle, on the passenger side, and I put my arm around her, around her neck, and I started walking with her and I said, "Come on inside[.]" I said, "[W]e're not getting a divorce, you can forget it, we're not getting a divorce."

And she said something about "they changed their mind." And she wasn't really talking a full sentence, she just kept saying, "They changed their mind, they changed their mind."

And I said, "Who changed their mind, who changed their mind?" Now, at that time, now, she was walking away from the business, away from the parking lot . . . . We were walking away from the parking lot and I turned and I took the gun out and then I fired it at the ground and I said, "Dammit," excuse my rhetoric. I said, "Get in here now," I said, "Get in here." And she said no and then I turned and fired the weapon again and I fired it at the ground.

At that time we had got into a tussle because my arm was around her and she had pulled out some kind of way and she had her hand on the gun like this and I told her, I said, "Take your hands off, take your hands off the gun," and she didn't, so I shot her in the wrist. I didn't shoot her to kill her, I shot her in the wrist.

And then next thing I know, she came down like this and I grabbed her up under her arm to pull her to come inside and she fell to the ground intentionally. She tripped up over her shoes and tried to make it seem like her shoes flew off . . . .

So she fell to the ground intentionally and I turned around and I put my hand on my head and I said, "Will you quit stalling?" I said, "Get up." I said, "Get in here now." And then I said, "Well you're going to tell me who you been sleeping with[.]"

. . . .

She would always – she told me that, "When I get my new husband, this is how I'm going to perform sexually for him." And she would always tell me how she's going to perform in graphic detail. And she said I'm so gross, on the phone, because she was baiting me to say things that I really didn't want to say.

And all I could think about was she was telling me how she was going to have oral sex with her new husband and that's when I leaned down and I said, "You going to tell me who you're sleeping with." And I leaned down and I put it on her arm, because I wasn't trying to kill her, I was trying to make her answer who she was sleeping with, and I shot her in the arm. And then I said, "You're going to tell me who you're sleeping with." And I just said, "This ain't worth it."

And then I turned around to walk away and go in there and get Jabril, but I leaned over her and that's when I got ready to shoot her in the other arm, because I [have] been taught that the best place to shoot a person when you're not trying to kill them is in the arm. You don't want to shoot them in the leg because they have main arteries in the leg. I did security, so I know pressure points. I mean I'm not trying to sound like I'm a hardcore criminal, but I was taught this in security where you can injure a person but not to kill them.

And when I leaned over to shoot her in the other arm, she turned. And if you look at the trajectory, or the moving object, or the bullet, and the angle that she was in, that's why I went – she said it went across her breast, into her breast and into her arm, because when they said I had shot her in the breast, I said, "No, I didn't shoot her in the breast[.]" I said, "I shot her in the arm."

So it went through her breast. I didn't intend to shoot her in the breast[.] I knowingly, willingly and intentionally shot her in her wrist and in her arm. And I intended to shoot her in the other arm, but it went across her breast or whatever. But I wasn't trying to shoot her in the breast, I was trying to shoot her in the other arm.

. . . .

> And I told her, after I shot her, I said, "You're going to have to explain to Jabril why his father killed hisself [sic]," because I was going to kill myself at that point. I was tired of living, I wanted to die. And I got ready to go in there to get Jabril and then I turned around and she got up and I looked at her, . . ., and she got up and she ran towards Dodson [Street]. And she was knocking on a car and she got in this like truck like, suburban truck or whatever, SUV truck, and I just got tired of telling her to come on in.

The defendant said he shot Ms. Muhammad three times, although she testified that she had "seven holes" in her body. He explained that these were entrance and exit wounds, saying "it wasn't that crucial."

After shooting Ms. Muhammad, the defendant returned to the shop to check on Jabril and contemplated committing suicide but was unable to do so. He "took off" in his car down Glass Street and saw three police officers as he rounded a curve. The defendant then wrecked his car, put more bullets in the clip of his gun which he planned to use to kill himself, jumped out of his car, with the gun firing at that time, and ran across the parking lot of Thankful Baptist Church. He fell down in a ditch where he dropped his gun and "saw that [he] didn't have a clip in it." As he was looking for the clip, he noticed a police officer standing behind the church, grabbed his gun, and started to leave when he heard someone say, "Drop your weapon." The defendant said he "zoned out" and thought, "This is it. . . . They'll kill me, and I just rather for them to go ahead and kill me than . . . trying to kill my own self." The next thing he remembered was being shot. The defendant admitted that he had rounds in the chamber of his gun, saying he "had clipped the gun several times" while he was in the ditch. However, on cross-examination, he denied firing his gun at Officer Forbes, saying he "didn't have a bullet in the chamber and . . . didn't have a clip in the gun." He acknowledged that his gun was in the "ready position" but denied pointing it at an officer, saying that he was wiping the sweat from his head. He said he was shot in the back and that the bullet exited through his chest.

Regarding the audiotape recorded by Officer Craw, the defendant acknowledged that he had said he was going to kill Ms. Muhammad if he saw her that day, explaining that he made that comment "out of irony because [he] was being interrogated by a detective" and "out of sarcasm." The defendant said that his comment about Jabril – "I shot that motherfucker, too" – was also made in sarcasm and that the gun had discharged accidentally.

Explaining why he shot Ms. Muhammad, the defendant said, "I was so distraught by her leaving me and being with another man, and all I could think in my head was everything she was saying she was going to do sexually that I wasn't getting, and I was thinking about that and I was not in my right frame of mind. If you knew me, from the past, if you knew me, you would know that that was not Ira Muhammad." He said Ms. Muhammad had caused him too much stress, the

-9-

shooting was "partially her fault," and if Ms. Muhammad had come inside the salon when he ordered her to do so, "none of this would have ever happened." The defendant denied he had intended to kill her, saying that he could have killed her had he wanted to do so because "[y]ou don't shoot someone in the arm and kill them, you shoot someone in the head, you shoot someone in the neck, you shoot someone in the chest. You collapse their lungs, you collapse their kidneys. That's what you do when you're trying to kill someone." The defendant said he shot Ms. Muhammad because he "wanted her to feel the same pain and hurt that [he] felt for everything she put [him] through and make her remember everything that she put [him] through and she will have to explain to [their] son why he doesn't have a father." According to the defendant, the only reason Ms. Muhammad was still alive was because he was "merciful." As to Jabril, the defendant admitted that he had placed Jabril "in harm of serious bodily injury, it was reckless endangerment. I recklessly put him in danger. I mean I wasn't trying to shoot him, I mean the gun fell out of my waist, I picked it up and it fired. I wouldn't try to kill my own son."

**Sentencing Hearing**

At the defendant's January 13, 2003, sentencing hearing, Jim Osterhout of the Tennessee Board of Probation and Parole, who prepared the defendant's presentence report, testified that the defendant was convicted of assault on May 7, 2001, and received a suspended sentence of eleven months and twenty-nine days for which he was still on probation at the time he committed the instant offenses.[2]

Marva Walker, Kimberly Muhammad's sister, testified about an encounter she had with the defendant on April 11, 2001, while driving down Dodson Avenue. The defendant, who was traveling down the wrong side of the road, pointed a "blue towel or something like that" at her and said, "B, I'll F you up if you F with me again." Ms. Walker could not see if the defendant had an object concealed under the towel but assumed that he did. Ms. Walker reported the incident to the police and said that the defendant's assault conviction for which he was on probation at the time of the instant offenses was related to this incident.

Jean Wolfford, a customer of Kimberly Muhammad's hair salon for three years, testified that she had witnessed the defendant threatening to kill Ms. Muhammad at the salon. Ms. Wolfford said that when the defendant came into the shop, Ms. Muhammad "would get so nervous that she couldn't do hair. Her customers would be so nervous, he ran all of them off so that she couldn't do work." Ms. Wolfford said that customers were afraid of the defendant because he "acted like a madman . . . like he was crazy."

Explaining Ms. Muhammad's absence from the sentencing hearing, her mother, Joanne Favors, testified that Ms. Muhammad was "very distraught" and "real disturbed." According to Ms.

---

[2]The defendant's presentence report reflects another conviction for assault on March 3, 1999, for which he received a six-month suspended sentence, and a 1996 juvenile conviction for assault for which he received six months probation.

Favors, the sentencing hearing would have been "too psychologically traumatic" for Ms. Muhammad. Ms. Favors testified regarding encounters she had with the defendant prior to October 26, 2001, saying he had frequently threatened to kill her and her family. Ms. Favors said that Ms. Muhammad had moved in with her after she and the defendant separated, and she had an order of protection against the defendant at the time he shot her. She said that Ms. Muhammad was shot four times, hospitalized for three days, and unable to work for months "because she had prosthetic devices on." As a result of the shooting, Ms. Muhammad was "very withdrawn . . . very nervous and apprehensive" and was going to close her business within the next few days. Ms. Favors believed the defendant posed a future threat to her and her family and said she would be "very, very fearful" if he were released from prison. Ms. Favors said that the defendant had not supported Ms. Muhammad or Jabril because "he was not able to maintain a job because of his inappropriate behavior."

Eddie R. Jacks, pastor of Galilee Baptist Church, testified that he had known the defendant all of his life and that the defendant was a member of his church. He described the defendant as "a nice kid" and said he had always obeyed him and the youth workers at the church. Even after the defendant changed religions and became a Muslim, he continued to visit Jacks at the church. To Jacks's knowledge, the defendant had never been in any trouble.

The defendant testified that his divorce from Ms. Muhammad became final in March 2002 and that he had not contacted her in the past fourteen months. He said that his incarceration had given him time to "deal with [his] emotions and [his] anger" and that he had attended anger management and alcohol and drug classes. He said that his fiancée was present at the sentencing hearing and, if he were granted probation or split confinement, they planned to marry. Regarding the incident with Marva Walker, the defendant denied pulling a gun on her and said he only pled guilty in that matter because he did not want a felony on his record. Saying that he was now "a changed man," the defendant asked the court to give him "a second chance." He said he did not want to have any contact with Ms. Muhammad when released but planned to have his visitation rights with Jabril reinstated.

## ANALYSIS

### I. Admission of Audiotape of Telephone Conversations

The defendant argues that the audiotape of telephone conversations between him and Ms. Muhammad "should have been excluded pursuant to Rule 401, 402 and 403 of the Tennessee Rules of Evidence as being the type of evidence which has probative value but it is 'substantially outweighed' by the prejudicial effect."

"Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Prior to trial, the defendant filed a motion to exclude the audiotape of the telephone calls, arguing that it was irrelevant and unfairly prejudicial. In overruling the motion, the trial court stated:

> [E]ven though I think some of this is repetitious, I think to take it out would be taking it out of context, because I do think some of the repetition shows the obsessiveness, shows the obsession that he has with her, shows the control that he has: "I don't care about the police, I don't care about anything, I'm in control here. The courts aren't in control, the lawyers aren't in control, I'm in control here and I'll do what I want to do," and I think those statements are probative to the effect that it shows that it doesn't matter. The police aren't going to stop him, the courts aren't going to stop him. If he makes up his mind to smoke her or to do whatever he's going to do, there's nobody that's going to stop him. And I think that's probative, again going toward that state of mind, that intent, that motive that he displays throughout this tape.

> And I do think, after reviewing this tape, other than those exceptions that I've talked about when she brings up things that may have happened in the past, I think the probative value and the relevance, so definitely relevant, but I think the probative value of these statements, showing his state of mind, his intent, his premeditation, and then actually carrying these acts out, I think far outweighs any prejudicial effect that these tapes would have, so I'm going to overrule that motion.

During the victim's testimony, an audiotape was played for the jury, which was a recording made by the victim of prior telephone conversations she had with the defendant. The defendant had placed the calls to her mother's house. Among his many profanity-laced comments were that she "ought to pay" for all she had put him through; that he was "liable to take the MF [his son] and be gone;" that he was "dealing with this shit myself;" that he was "waiting to come across [the victim's] sister;" that he was the "MF[3] judge and jury of [his] MF life;" and if anything happened to his mother because of stress, he would "take this shit out on [the victim's] MF mother." Asked by the victim not to hurt their child, the defendant replied, "I guarantee I shoot that MF in his GD face. That ain't my MF kid." He said, "I guarantee you I smoke your MF ass. . . . They ain't taking my fucking life. I will take yours. And that MF bastard. That ain't my MF kid." Toward the end of one conversation, he spoke of an incident in California, saying "MF California, he killed his MF wife

---

[3]In his conversations, the defendant did not utilize the shortened version of this word, as we have done.

-12-

(unintelligible) fucking screaming and then shoot his other MF son and killed his MF (unintelligible)."

Following a hearing, the trial court ruled that these statements by the defendant were admissible pursuant to Tennessee Rule of Evidence 803, as admissions by a party-opponent and as showing his "state of mind . . . intent, plan, motive, design." Additionally, the parties argued as to the application of, and the court considered, Tennessee Rule of Evidence 404(b) which sets out the circumstances under which proof of other acts is admissible in a criminal prosecution:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Generally, this rule is one of exclusion, and evidence is not admissible that an accused has committed some other crime or bad act independent of that for which he is charged, even though it may be a crime or act of the same character as that for which the accused is on trial. See State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). If, however, evidence that a defendant has committed a crime separate from the one for which he is being tried is relevant to some matter actually in issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. See id. "Only in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995).

Although the trial court determined that the audiotape of the conversations was admissible pursuant to Rule 803, the hearing conducted on the matter substantially complied with the requirements of Rule 404(b), meaning that this court reviews its decision to admit or exclude

-13-

evidence under an abuse of discretion standard. See State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997). The trial court in this case conducted the appropriate jury-out hearing and stated that the probative value of the statements outweighed their prejudicial effect.

The court explained that the audiotape of the defendant's statements was admissible to show the required intent for the offense of attempt to commit first degree murder. As explained by Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[10] (4th ed. 2000), "[w]here it must be shown that a criminal defendant had a specific criminal intent, Rule 404(b) permits the court to admit evidence of other crimes or acts of the defendant to show the requisite intent for the crime charged." This court explained the principle in State v. Coulter, 67 S.W.3d 3, 48 (Tenn. Crim. App. 2001):

> Because the appellant in this case did not dispute that he had killed his wife, the principal issue at trial was whether the appellant possessed the requisite mental state, particularly premeditation. Our supreme court has noted that "a determination of culpable mental states, such as premeditation . . ., must [often] be inferentially made from the circumstances surrounding the killing." State v. Hall, 958 S.W.2d 679, 704 (Tenn. 1997). Among the relevant circumstances are facts about the defendant's prior relationship and conduct with the victim from which the jury may infer a motive. Id.; see also State v. Jones, 15 S.W.3d 880, 889 (Tenn. Crim. App. 1999); State v. Schafer, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995); [State v.] Gentry, 881 S.W.2d [1,] 5 [(Tenn. Crim. App. 1993)].

Applying that principle, this court determined that the trial court had not abused its discretion in allowing into evidence certain letters which the defendant had written to his wife before killing her:

> [A]lthough the State introduced other evidence concerning the Coulters' relationship prior to this offense, the challenged notes and letters uniquely imparted the appellant's perspective on his marriage and on his ongoing dispute with his wife as the appellant wrote the notes and letters contemporaneously with the dispute. Thus, by virtue of these documents, the jury was able to more accurately assess the bitterness of the dispute, which persisted for at least one year prior to this offense. Again, several of the documents reflect the appellant's anger at his wife's withdrawal from any intimacy with him and possible infidelity despite her continued cohabitation with him. More importantly, several documents also reflect the appellant's fervent desire to reconcile with his wife and his opposition to ending their marriage. In assessing whether this evidence could reasonably affect the probability of premeditation in the context of other evidence

introduced at trial, the trial court was entitled to "draw upon common sense, general knowledge, and its understanding of human conduct and motivation." [State v.] Hayes, 899 S.W.2d [175,] 183 [(Tenn. Crim. App. 1995)].

Id. at 49.

In the present appeal, the defendant was charged with the attempted first degree murder of his wife and son, the indictments charging that he "unlawfully, intentionally and with premeditation attempt[ed] to kill" each. The trial court determined that the audiotape of the defendant's telephone calls to his wife was relevant to show his state of mind and anger toward his wife. The evidence supports this determination.

## II. Failure to Suppress Audiotape of Statements

The defendant argues that the audiotape of his statements recorded by Officer Craw after he was shot should have been suppressed. He claims that the tape was an "electronic surveillance," requiring either a warrant or the consent of one of the participants, and that he was in custodial interrogation at the time he made the statements.

In ruling that this audiotape was admissible, the trial court concluded, following the hearing on the motion to suppress, that the defendant's answering questions from medical personnel did not constitute an "interrogation," even though a law enforcement officer was listening and recording:

> In this particular case, I don't think there is any question about the fact [the defendant] was in custody. I don't think there's any question about the fact that the focus of suspicion had centered on [the defendant]. The only question is whether or not this was an in-custodial interrogation.
>
> I find nothing in the proof before me that shows that in any way this was an interrogation. The only proof of that is by [the defendant], who says that there was a person in a dark suit asking him questions. Of course, going to the reliability and credibility of [the defendant's] testimony is the fact that he himself said he was going in and out of consciousness. And I think it's clear from the statement that was introduced, at that point in time [the defendant] didn't care who was there or who was asking questions, he was going to say what he was going to say and he was going to do it.
>
> It is obvious from the statement that this was nothing more than a spontaneous utterance on his behalf, without benefit of being interrogated. I don't find that it's an in-custodial interrogation.

-15-

As to the admissibility of the statement, I do find it's admissible. As to the weight of those statements, that's a question for the jury to make a determination: whether in fact he was confused at the time, whether in fact he was in and out of consciousness, and whether in fact these were nothing more than ironic statements and whether he meant what he said. Those are all questions for the jury to make the determination. But the court finds no problem with the admissibility of this spontaneous utterance on behalf of [the defendant]; therefore, the court overrules the motion to suppress.

The question, as correctly viewed by the trial court, was whether the defendant was "in custody" at the time of his statements to medical personnel. Authorities considering similar situations concluded that such interrogations were not custodial, and, thus, statements by defendants were admissible although they had not been advised of their Miranda rights. In People v. Mosley, 87 Cal. Rptr. 2d 325, 328 (Cal. Ct. App. 1999), an officer, investigating a shooting in a residential area and to determine what had happened, went to the defendant who was being treated at the scene in an ambulance. In response to the officer's question as to the facts of the incident, the defendant said that he had been a pedestrian and shots had been fired from a vehicle, striking him. However, the officer noticed the defendant's belt buckle identified him as a member of a certain street gang. The officer brought to the ambulance a witness to the shooting, who said that the defendant had jumped out of a vehicle which had traded shots with another vehicle. Noting that the few questions asked of the defendant were in the presence of medical personnel, the questions were not accusatory, and the defendant was to be transported to a hospital rather than jail, the court concluded that the defendant's statement was admissible even though he had not been advised of his Miranda rights:

Our review of the facts of the instant case leads us to the conclusion that defendant was not in custody within the meaning of Miranda when he was being treated by paramedics in the ambulance prior to being transported to the hospital. Any restraint of defendant's freedom of action was caused by the need to treat his gunshot wound, which was still bleeding and was actively being treated during the interview. He had not been placed under arrest because the police did not know what had happened that caused him to be shot. If he was a victim of a shooting they needed information to put out a broadcast on his assailants. They knew that two shootings had occurred, but they did not know at the time of the interview what started the shooting, who was involved, or even if the two shootings were related to each other.

Id. at 331-32.

Other courts considering similar facts determined, as well, that the statement of a defendant during medical treatment was admissible as noncustodial, although he had not been advised of his

-16-

Miranda rights. See Wilson v. Coon, 808 F.2d 688, 689-90 (8th Cir. 1987) (at scene of automobile accident, officers asked defendant if he had been driving one of the vehicles as he was receiving medical treatment, and statement was admissible although he had not been advised of his rights); United States v. Martin 781 F.2d 671, 673 (9th Cir. 1985) (defendant's statement to officers at hospital where he was being treated that he had been making bombs in an apartment, the destruction of which officers were investigating, was admissible although he had not first been advised of his rights).

Applying these principles to the present appeal, it is clear the trial court correctly concluded that the audiotape of the defendant's statements recorded by Officer Craw was admissible. At the time, the defendant was being treated by medical personnel for a gunshot wound. All questioning was by medical personnel and Officer Craw, opportunistically, turned on his personal tape recorder. There is no proof that he in any way initiated the questioning or asked that the defendant be questioned about the incident which just had occurred. Given all of this, we concur in the trial court's ruling that the statement was noncustodial and, thus, admissible against the defendant.

As for the claim that the questioning constituted illegal surveillance, that argument is presented for the first time on appeal. Accordingly, it is waived.

### III. Consecutive Sentencing

The defendant argues that the trial court erred in ordering that his sentences be served consecutively, saying there was no "factual basis showing that [he] was necessarily sentenced to consecutive sentencing to protect the public."

As a general rule, consecutive sentences are imposed at the discretion of the trial court upon its consideration of one or more of the following statutory criteria:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person as declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. In ordering that the defendant's sentences be served consecutively, the trial court applied criteria (4) and (6), finding that the defendant was a dangerous offender and that he was on probation when he committed the instant offenses:

Now the question as to whether or not these sentences should run consecutively or concurrently. The court, in considering TCA 40-35-11[5], (6), the court finds that there were multiple convictions that did occur while he was on probation.

The court does find, under 40-35-11[5], Subsection 4, that [the defendant] is a dangerous offender. Anyone who would call his soon-to-be ex-wife and go out and say, "I'm going to kill you, I'm going to kill that child," and then take steps to do it, and callously, cold-heartedly, unmercifully, catch her in the early morning hours, chase her across the street after he's already fired the gun at the baby and get her down on the ground while she's screaming for help and fire a gun at her and try to kill her, then leave, when the police come, and then attempt to kill the police officers, I think that's a dangerous offender. This court finds that's a dangerous offender.

And I find it's one who has little or no regard for human life. It didn't matter if anybody else was in the street, driving down the road, or if anybody else was around, he had a mission and he was on

-18-

that mission and he was not to be deterred by anybody; not the police, not the courts, not the judge, not anyone.

I find that the risk to human life is high because of his actions. He is one who does not – that those actions indicated a risk to human life is high.

I find that the consecutive sentence is necessary due to the severity of offenses. As I said, Mrs. Muhammad, by the grace [of] God, is here alive, not here, but alive in this world today through no fault of [the defendant], because he did everything he could to keep that from happening, to snuff out her life like you'd blow out a candle.

And I find that consecutive sentences are necessary to protect the public from further action, because, as I said, based on what I've heard here today, this is not over. It may be a temporary lull, he may try to pull the wool – he pulled the wool over the jury's eyes, but he is not going to pull the wool over this court's eyes. He is not the court, he is not the judge, contrary to what he said. It's my duty to follow the law and see that justice is done, and to do anything less in this case would not be justice, because it's not over.

This record reflects that the trial court, in imposing consecutive sentences, followed the statutory sentencing procedures, made appropriate findings of fact, and gave proper consideration to the sentencing principles. Therefore, our review of the imposition of consecutive sentencing by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d); State v. Adams, 45 S.W.3d at 46, 62 (Tenn. Crim. App. 2000).

Applying the foregoing, we conclude that the record supports the trial court's imposition of consecutive sentences. The trial court found that the defendant was on probation for a prior assault conviction at the time he committed the instant offenses, and he does not contest this fact. Only one ground need exist for imposition of consecutive sentencing. Thus, even if the defendant's arguments were correct as to the finding he is a dangerous offender, the fact remains that he was on probation when he committed the present offenses. Accordingly, this assignment is without merit.

## IV. Constitutionality of Tennessee Code Annotated section 40-35-115

The defendant argues that this code section violates the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 6, 8, 9, 14, and 16 of the Tennessee Constitution.

The State responds to these arguments by saying that the defendant is raising claims on appeal which were not presented to the trial court. Accordingly, we first will review how this issue was presented to the trial court. In his motion for new trial, the defendant argued that the Tennessee procedures for determining whether consecutive sentencing is appropriate violated his Fifth and Sixth Amendment right to counsel as well as his right to trial by jury:

> Tennessee sentencing guidelines are unconstitutional and that they failed to place defendant on notice of the enhanced punishment resulting from consecutive terms of sentencing upon conviction prior to trial. Such sentencing guidelines violate the right to representation by counsel under the Fifth and Sixth Amendments, the right to indictment[.]

> Tennessee sentencing guidelines fail to protect the defendant's right to a trial by jury upon conviction of substantive offense and consecutive sentencing terms deny defendant the right to trial by jury and enhancement of sentence is not supported by finding of fact by a trial by jury[.]

At the hearing on the motion for new trial, the defendant argued that the Tennessee procedures for consecutive sentencing denied him "constitutional protections:"

> Your Honor, the next issue we'd like to address involved sentencing. We had filed several different issues, but they all, I think, can be tied into one.

> Essentially, Your Honor, the defendant did not receive notice, he did not receive the guarantees of the Constitution of the United States and of the State of Tennessee by way of indictment for an enhancement outside the sentencing guideline range for the consecutive sentencing which was applied to [the defendant].

> There are, in Tennessee's law and Tennessee's guideline range and Tennessee sentencing guidelines, the application of consecutive sentencing in certain circumstances that was applied to [the defendant]. We believe that it's unconstitutional way, [sic] the Tennessee guidelines are currently set forth and that the denial of notice, the denial of an indictment, the denial of a trial by jury on that enhancing factor resulted in a sentence which was outside the guideline in which he was denied the constitutional protections for those, for the unconstitutional construct of Tennessee's sentencing guidelines. We're going to raise that on appeal as well if it is denied

-20-

by Your Honor and so we would like to bring those issues before the court.

As we understand the defendant's claim as to this issue, he argues that the bases for the consecutive sentences, the court's findings that he was a dangerous offender and was on probation when he committed the offenses which resulted in the present appeal, "are in fact elements of a separate offense which should be charged in indictments as required by the United States and Tennessee Constitutions and tried by a jury of peers as required by the Tennessee and United States Constitutions as opposed to the unconstitutional practice of allowing the Court to make a determination based upon the finding of a preponderance of the evidence." He claims that he "did not have appropriate notice to prepare for this additional 'sentencing guideline' which enhanced [his] sentence."

We will review the holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), upon which the defendant relies for this assignment. Apprendi was convicted, on a plea of guilty, of using a firearm for an unlawful purpose, a second degree offense under New Jersey law that carried a sentence range of five to ten years in prison. There was evidence, although disputed by Apprendi, that his offense, shooting into the home of an African-American family, was racially motivated. New Jersey had a separate "hate crime" statute that increased the punishment for a second degree offense to a prison term of ten to twenty years if the court found, by a preponderance of the evidence, that the defendant committed the underlying offense with a purpose to intimidate an individual or group because of race, color, gender, handicap, religion, sexual orientation, or ethnicity. Id., 530 U.S. at 468-69, 120 S. Ct. at 2351. Apprendi was not charged under the hate crime law, and, though pleading guilty to the underlying offense, he objected to the sentence enhancement under that law. The judge rejected the challenge, applied the sentence enhancement, and sentenced Apprendi to twelve years.

On appeal, the Supreme Court concluded that the fact that the underlying offense was committed with a purpose to intimidate an individual or group because of race, color, gender, handicap, religion, sexual orientation, or ethnicity was a necessary element for increasing the punishment. Id., 530 U.S. at 501, 120 S. Ct. at 2369. Specifically, the Supreme Court held:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions in [Jones v. United States, 526 U.S. 227, 119 S. Ct. 1215 (1999) ]: "It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." 526 U.S. at 252-53 (opinion of Stevens, J.); see also 526 U.S. at 253 (opinion of Scalia, J.).

Id., 530 U.S. at 490, 120 S. Ct. at 2362-63 (emphasis added) (footnote omitted).

The specific argument made by this defendant, that only a jury may make the determination to impose enhanced punishment even within the range for the convicted offense, was rejected in Apprendi, which explained the "sentencing factors" the trial court may apply and the difference between these and elements of a greater offense:

> The term appropriately describes a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense. On the other hand, when the term "sentence enhancement" is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an "element" of the offense.

Id., 530 U.S. at 494, 120 S. Ct. at 2365 n.19.

Courts have interpreted the holding in Apprendi to allow the trial court to determine whether sentences should be served consecutively. United States v. Samuel, 296 F.3d 1169, 1175 (D.C. Cir. 2002) ("[T]he district court did not commit Apprendi error when it enhanced [the defendant's] sentence because he committed the second of his narcotics offenses while he was on release for the first."), cert. denied, 537 U.S. 1078, 123 S. Ct. 680 (2002); People v. Williamson 747 N.E.2d 26, 34 (Ill. App. Ct. 2001) (trial court may consider "the nature and circumstances of the offense and the history and character of the defendant" in determining whether consecutive sentencing "is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record"). Accordingly, we conclude that the defendant's arguments based upon the Apprendi holding are without merit.

The defendant also argues on appeal that his consecutive sentences amounted to "cruel and unusual" punishment, as well as his rights to equal protection and due process of law, and that Tennessee Code Annotated section 40-35-115(b)(4) is void for vagueness by not sufficiently defining "dangerous offender." These arguments were not raised in the motion for new trial, argued at the hearing on that motion, or supported by authorities in the defendant's brief. Accordingly, they are waived. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b); State v. Aucoin, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988) ("[A] defendant may not object to the introduction of evidence on one ground, abandon this ground, and assert a new basis or ground for the objection" on appeal.).

The defendant's arguments as to his sentencing are without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE